1
2

DENNIS K. BURKE
United States Attorney
District of Arizona

3
4
5

PAUL V. ROOD
Assistant U.S. Attorney
Arizona State Bar. No. 12850
Two Renaissance Square
40 North Central Avenue, Suite 1200
Phoenix, Arizona 85004-4408
Telephone: (602) 514-7500

6
7

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

8  United States of America,

9          Plaintiff,

10     v.

11  $135,900.00 in United States Currency,

12          Defendant.

**VERIFIED COMPLAINT FOR
FORFEITURE IN REM**

13      Plaintiff, United States of America, by and through its attorney, Dennis K. Burke, United

14  States Attorney for the District of Arizona, Paul V. Rood, Assistant United States Attorney, of

15  counsel, brings this complaint and alleges as follows.

16                    **NATURE OF THE ACTION**

17      1.      This is a civil action in rem, brought to enforce the provision of 21 U.S.C. §

18  881(a)(6) for the forfeiture of currency which is and represents currency furnished or intended

19  to be furnished by any person in exchange for a controlled substance.

20      2.      This is a civil action in rem, brought to enforce the provision of 18 U.S.C. §

21  981(a)(1)(A) for the forfeiture of currency which is comprised of funds involved in a transaction

22  or attempted transaction in violation of 18 U.S.C. §§ 1956 and 1957, or property traceable to

23  such property.

24                    **JURISDICTION AND VENUE**

25      3.      Plaintiff brings this action in rem in its own right to forfeit and condemn the

26  defendant under 18 U.S.C. § 981, and 21 U.S.C. § 881(a)(6). This Court has jurisdiction over

1   this action under 28 U.S.C. §§ 1345 and 1355.  Venue is proper in this district pursuant to 28

2   U.S.C. §§ 1355, 1395, 18 U.S.C. § 981(h), because the property was found in this district.

3                                    **THE DEFENDANT IN REM**

4          4.      The defendant consists of the following property:  $135,900.00 in U.S. Currency

5   seized from Victor Luis Sadyr Ayala on July 4, 2009.

6                                           **FACTS**

7          5.      On July 4, 2009, at approximately 8:29 a.m., Officer Randy Sherlock ("Officer

8   Sherlock") was patrolling traffic northbound on U.S. Highway 163.

9          6.      Officer Sherlock noticed a tan colored extended cab truck traveling southbound

10  on U.S. Highway 163 at mile post 395 driving in the number one traffic lane well below the

11  speed limit.  The truck was being followed by another vehicle.

12         7.      Officer Sherlock turned his vehicle around and followed the truck while it stayed

13  in the number one traffic lane as the vehicle following it passed.

14         8.      From mile post 394.5 to mile 393.5, the truck remained in the number one lane

15  then slowly changed lanes as it approached the U.S. Highway 160/163 junction with a delayed

16  use of the right turn signal.  This constituted a violation of ARS:28-721.B., failure to drive of

17  right side of road.

18         9.      The U.S. Highway 160 westbound is currently under construction, therefore,

19  Officer Sherlock followed the truck westbound to mile post 393 where he initiated a traffic stop

20  by turning on his emergency lights and sounding his siren to get the driver's attention.

21         10.     The driver slowly came to a stop past mile post 393.  The truck displayed Nebraska

22  license plate REE843.

23         11.     Officer Sherlock greeted the driver from the passenger side of the vehicle and

24  identified himself as "Officer Sherlock with the Navajo Police."

25         12.     Officer Sherlock advised the driver of the reasons he was stopped.

26  . . .

                                                2

13.     Officer Sherlock requested and was granted from the driver his driver license, vehicle registration and vehicle insurance.  The driver produced an international photo license from Mexico which identified him as Victor Luis Sadyr Ayala ("Ayala").

14.     Ayala's hands were visibly shaky as he handed Officer Sherlock the vehicle papers.

15.     Officer Sherlock noted an overwhelming odor of air freshener, saw a vitamin water bottle resting on the passenger side floor, and a blue piece of luggage on the rear seat.  There was a blue colored air freshener hanging from the steering column.

16.     Officer Sherlock requested Ayala exit the vehicle and instructed him to stand by the right front area of Officer Sherlock's patrol vehicle.

17.     Ayala placed his hands in his pockets.  Officer Sherlock told Ayala to keep his hands in view for officer safety reasons.

18.     Officer Sherlock began writing out the traffic citation and engaged Ayala in conversation.  Ayala stated he was coming from Omaha, Nebraska and was going to Flagstaff to see his friend near a big mall which was located in the middle of Flagstaff.

19.     Ayala stated he had been driving and rested in Blanding the previous night.

20.     Officer Sherlock asked Ayala why he was going to Flagstaff.  Ayala stated he was going to see his cousin and maybe visit for two or three days for the 4th of July holiday.

21.     Ayala stated he was going to visit his cousin, Juan, who worked at a Chili's restaurant.

22.     Officer Sherlock asked Ayala how he knew his cousin.  Ayala stated he had been messaging him on the internet.

23.     Officer Sherlock noticed the vehicle was registered to a Felipe Mancinas ("Mancinas") of Omaha, Nebraska.  Officer Sherlock asked Ayala where Mancinas was.

24.     Ayala stated he works with Mancinas on separate teams working roofing jobs.  Ayala stated Mancinas was off work for one week.

3

1    25.    Officer Sherlock requested warrant checks on Ayala and the vehicle through the

2    Kayenta Police Department.  The dispatcher advised no record was found on the UCJIS terminal.

3    26.    Officer Sherlock noticed Ayala appeared nervous.  Ayala was leaning up against

4    the patrol vehicle and kept placing his hands in his pockets.  Officer Sherlock reminded Ayala

5    to keep his hands in view.

6    27.    Officer Sherlock finished writing the citation and had Ayala sign it.

7    28.    Ayala thanked Officer Sherlock and started to walk back to his vehicle.  As Ayala

8    got by the bed of the truck, Officer Sherlock called Ayala's name and wanted to know if he

9    could ask Ayala some more questions.  Ayala agreed, stating "yes, officer."

10   29.    Officer Sherlock asked Ayala how long he was going to be in Flagstaff.  Ayala

11   stated he was just visiting his cousin, Juan.

12   30.    Officer Sherlock asked Ayala where Juan lived.  Ayala stated he didn't really

13   know, but that he lives near the big mall in Flagstaff.

14   31.    Officer Sherlock asked Ayala how he was going to reach Juan once he arrived in

15   Flagstaff.  Ayala stated he was going to message Juan.

16   32.    Officer Sherlock asked Ayala if he knew Juan's phone number.  Ayala stated, "Uh,

17   uh, uh, it's 909....don't remember."

18   33.    Officer Sherlock asked Ayala if he knew where Juan worked.  Ayala stated, "Uh,

19   uh, it's in Flagstaff."

20   34.    Officer Sherlock again asked Ayala how long he was going to visit Juan.  Ayala

21   stated he was going to see Juan Lopez for about to two three days, and he would decide how

22   long he would stay once he got to Flagstaff.

23   35.    Officer Sherlock asked Ayala why he didn't come with the owner of the vehicle.

24   Ayala stated Mancinas was back in Nebraska.

25   36.    Officer Sherlock had reason to believe Ayala was involved in criminal activity

26   based on his training, experience, and the following indicators:

4

- • Ayala's nervousness; shaky hands, leaning against police vehicle
- • Overwhelming odor of air freshener upon contact at vehicle cab
- • Vehicle displayed a Nebraska license plate, possibly indicative of a cross-country trip
- • Vehicle was traveling on U.S. Highway 160, a known trafficking corridor
- • Vehicle was traveling southbound, consistent with transporting currency to source areas
- • Driver was alone, generally not common for long trips
- • The registered owner of the vehicle was not present, a common tactic to avoid asset forfeiture
- • The driver was coming from Nebraska, a known destination area for narcotics
- • Ayala appeared to search for answers to Officer Sherlock's questions
- • Ayala not knowing his cousin's address or phone number in Flagstaff
- • Not a cost effective trip for visiting a cousin

37.     Officer Sherlock asked Ayala if there were any weapons, explosives, large amounts of money, or any illegal narcotics, such as cocaine, heroin, methamphetamine, or marijuana in the vehicle.  Ayala replied no to each question.

38.     When Officer Sherlock asked if Ayala had a large amount of currency with him, Ayala looked away, broke eye contact, cleared his throat, and slowly stated "no."

39.     Officer Sherlock asked Ayala for permission to search the vehicle.  Ayala stated, "yes, officer, go ahead."

40.     Officer Sherlock prepared a Navajo Department of Law Enforcement Consent to Search Form, and explained the form to Ayala.  Ayala read the form in both English and Spanish.  Officer Sherlock observed Ayala move his head back and forth as he read the form, saying some of the words out loud.

41.     Ayala signed his name and dated the form.  Ayala gave a verbal and written consent to search at about 8:50 a.m.

42.     Officer Sherlock asked Ayala if he could conduct a pat down of Ayala's outer clothing and asked Ayala if he had any weapons on his person.  Ayala agreed to the pat down and stated he did not have any weapons.

43.     Officer Sherlock felt a large bulge in Ayala's left back pocket.  The shape was consistent with currency that was folded in half.  Officer Sherlock asked Ayala what it was.  He stated, "my money."

44.     Ayala removed the money from his pocket and handed it to Officer Sherlock. Officer Sherlock acknowledged it was money and handed it back to Ayala to put in his pocket.

45.     Officer Sherlock had Ayala walk to the right front area of his vehicle while Officer Sherlock searched Ayala's vehicle.

46.     Ayala slowly turned toward Officer Sherlock and said, "officer, I have three thousand dollars in the center console underneath the cup holder."

47.     Officer Sherlock told Ayala he'd check to make sure his money was there.

48.     Officer Sherlock thought it strange that Ayala had previously told Officer Sherlock he did not have any large amounts of money on his person.

49.     Officer Sherlock took photographs of the vehicle before he started the search.

50.     At approximately 0855 hours, Officer Sherlock deployed his departmental canine partner "Leon", a trained and certified narcotics detector canine to conduct a free air sniff around the vehicle.

51.     Leon worked the rear bumper then along the driver bed area of the vehicle.  Once Leon reached the driver's door area, he started sniffing very close to the door and exhibited a change of behavior near the left front fender wherein he started scratching at the area.

. . .

. . .

52.     Officer Sherlock took note of Leon's behavior change as he continued around the driver's front bumper.  Leon sniffed more closely again on the grille and bumper area and scratched aggressively.

53.     Officer Sherlock has witnessed this type of behavior from Leon when he has been in the presence of an overwhelming odor of narcotics.

54.     Officer Sherlock started his search of the vehicle by checking the center console area where Ayala stated his money was located.  As Officer Sherlock removed the cup holder from the console he saw three small bundles of U.S. Currency bound in black rubber bands resting on the bottom.  Officer Sherlock photographed the currency.

55.     Officer Sherlock requested assistance from another police officer in searching the vehicle and keeping a visual on Ayala.  Navajo Police Officer Craig Laughter ("Officer Laughter") responded to the request.  Officer Sherlock briefed him on the traffic stop. Lieutenant Roger Yazzie ("Lieutenant Yazzie") with Kayenta Criminal Investigations also responded to the scene.

56.     Officers Laughter and Sherlock started their search of the vehicle in the cab. Officer Sherlock observed excessive tooling to the screws on the glove compartment and the entire center console area.  No currency was located in the vehicle cab.

57.     Officer Sherlock opened the vehicle hood and saw excessive tooling marks to the four bolts which secured the radiator to the front radiator cross member.  The four screws showed obvious shiny edges around the bolt heads and it looked as though it had been unscrewed many times.

58.     Further inspection revealed the black small round fasteners which secured the black molding cover over the radiator and air conditioner unit had tool markings as well.  The center fasteners appeared to have been removed numerous times with gauge marks and rough edges clearly visible.

. . .

59.     Officer Sherlock unsnapped the black fasteners and removed the black molding from the top of the radiator unit and air conditioner core unit.

60.     Officer Sherlock shined his flashlight between the units and saw numerous bundles wrapped in black duct tape stacked and hidden in a concealed manner.

61.     Lieutenant Yazzie and Officer Laughter looked at the packaging hidden between the units.  Officer Sherlock took photographs of the packaging before removing one of the bundles.

62.     Once removed, Officer Sherlock cut through the duct tape which revealed a large amount of U.S. Currency inside.

63.     At about 10:24 a.m., Officer Sherlock photographed the bundles and labeled them items #1 through #5.  Officer Sherlock secured the bundles as evidence and turned it over to Lieutenant Yazzie for custody and storage.

64.     At about 10:50 a.m., Officer Sherlock asked Ayala about the currency located in the center console area.  Ayala stated the amount was $3,000 he had earned from working roofing jobs in Nebraska.

65.     Officer Sherlock asked Ayala if the five additional bundles of currency wrapped in duct tape officers had discovered belonged to Ayala.  Ayala quickly stated he didn't have any knowledge of that money being in the engine compartment.

66.     Ayala had a surprised look on his face and kept stating "Officer, I didn't know that money was there."

67.     Officer Sherlock asked Ayala who the owner of the five bundles of currency was. Ayala promised Officer Sherlock he didn't know.

68.     Officer Sherlock asked Ayala if the currency might belong to Mancinas, the registered owner of the vehicle.  Ayala again stated, "I don't know, Officer."

69.     Officer Sherlock asked Ayala who he thought might be the owner of the currency. Ayala stated he didn't know.

70.    Officer Sherlock told Ayala transporting that amount of U.S. Currency is clearly defined as money laundering, meaning he's transporting monies without reporting it to the Internal Revenue Service for taxes and documenting legitimately earned income.  Ayala again stated he didn't know to whom the currency belonged.

71.    Ayala stated the $3,000 dollars was the only money that belonged to him.

72.    Officer Sherlock told Ayala that since Ayala didn't know the owner of the five bundles of currency, Ayala would be charged with money laundering.  Ayala quickly stated, "Officer, that's not my money."

73.    Officer Sherlock presented Ayala with a Navajo Department of Law Enforcement's Disclaimer of Ownership of Currency or Property form.  Officer Sherlock read the entire form to Ayala.

74.    Officer Sherlock had Ayala read both the English and Spanish language versions of the form.  Ayala read the form aloud and stated the currency wasn't his.

75.    Officer Sherlock asked Ayala what his highest level of education was.  Ayala stated he had a college education.

76.    Officer Sherlock asked Ayala if he had a legal interest to claim the large amount of currency.  Ayala again stated, "No, officer, it's not my money except the $3,000."

77.    At 10:50 a.m., Ayala signed the English and Spanish language disclaimer forms for the five bundles of currency.  Officer Sherlock signed as a witness and had Lieutenant Yazzie also sign as a witness.

78.    Navajo Police Officer Vernon Nelson arrived on scene and drove the vehicle to the Kayenta Police Department.  Once there, Officer Sherlock and Lieutenant Yazzie continued searching the vehicle.

79.    After the search was completed, Officer Sherlock gave Ayala's $3,000 back to him at 12:17 p.m., and he was released to his destination.

. . .

80.     Ayala asked if there was a cab service in town.  Officer Sherlock told Ayala there was no cab service, but he should call a family member or his cousin, Juan Lopez in Flagstaff for assistance.  Ayala looked at Officer Sherlock with a blank expression on his face as if he didn't know a Juan Lopez.

81.     Custody of the five bundles of currency was transferred to Special Agent James Newton ("SA Newton") with the Federal Bureau of Investigation.  On July 7, 2009 SA Newton transported the five bundles of currency to the Phoenix office for deposit into the DOJ Asset Forfeiture Fund.

82.     The currency was contained in five heavily wrapped bundles and numbered one through five.  SA Newton and SA Stephen Belongia removed the currency from multiple layers of heavy tape as well as a foil type material and plastic.

83.     The currency from bundles two, four, and five were combined and sealed in a K-Pak bag.  A breakdown of the currency is as follows:

| Number of bills | Denomination | Total Per Denomination |
| --- | --- | --- |
| 374 | $100.00 | $37,400.00 |
| 220 | $50.00 | $11,000.00 |
| 3507 | $20 | $70,140.00 |
| 156 | $10 | $1,560.00 |
| 157 | $5 | $785.00 |
| 35 | $1 | $35.00 |
| TOTAL | | $120,920.00 |

84.     The currency from bundles one and three were combined and sealed in a separate K-Pak bag.  A breakdown of the currency is as follows:

| Number of bills | Denomination | Total Per Denomination |
| --- | --- | --- |
| 57 | $100.00 | $5,700.00 |
| 50 | $50.00 | $2,500.00 |
| 331 | $20.00 | $6,620.00 |

| 16 | $10 | $160.00 |
| TOTAL | | $14,980.00 |

85.     Photos were taken of the currency before and after the wrapping material was removed.  The wrapping material was placed into evidence.

86.     The defendant currency was subject to administrative forfeiture proceedings; however, Vanessa Coronel filed a claim on September 10, 2009.

## **FIRST CLAIM**

The defendant currency represents proceeds of trafficking in controlled substances, or was used or intended to be used in exchange for controlled substances, or was used or intended to be used to facilitate a violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801, *et seq*., and is, therefore, subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6).

## **SECOND CLAIM**

The defendant currency represents funds which have been involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956 and 1957 and is, therefore, subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

WHEREFORE, the United States of America prays that process of warrant in rem issue for the arrest of the defendant; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring the defendant be forfeited to the United States of America for disposition according to law; and that the United

. . .

. . .

. . .

. . .

. . .

. . .

11

1   States of America be granted such other relief as this Court may deem just and proper, together

2   with the costs and disbursements of this action.

3       Respectfully submitted this 9th day of December, 2009.

4                                       DENNIS K. BURKE
                                        United States Attorney
5                                       District of Arizona

6                                       S/*Paul V. Rood*

7                                       PAUL V. ROOD
                                        Assistant U.S. Attorney
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26